## MARY B. BROWN AND WILLIAM BROWN *vs.* WALLACE AND MITCHELL.—*December*, 1832.

A decree directed a trustee appointed by the court "to sell such part of the property in the proceedings mentioned, as may be sufficient to pay the sum due from W M, to the heirs of J M." The decree contained the usual instructions as to the course and manner of the trustee's proceedings. The trustee divided the property into lots; and after having effected sales to the amount of the sum due as aforesaid, he exhibited an authority from such of the defendants in the cause as were of full age, which stated "we do hereby authorise and request the said W, trustee aforesaid, to sell the whole of the property mentioned in the said proceedings, on the same terms as is mentioned in the said decree, and authorise and request the Chancellor to ratify and confirm such sale when made by said trustee;" and then proceeded to make further sales at the same time and place. These facts were fully reported to the Chancellor, who ratified the sale. The purchaser of a lot, sold after the production of the aforesaid authority, gave his bond to W, as trustee, and took from him a receipt for the bond and an agreement to make a conveyance upon its payment, signed by W, as trustee. HELD, That the entire sale was effected by W in his character of trustee.

Whether a sale, made under the circumstances above mentioned, is voidable on account of the trustee having exceeded his authority, and whether he sold as trustee, are not questions open to investigation, after his report, fully disclosing the facts, had been finally ratified, and no appeal taken. These were questions necessarily brought to the Chancellor's attention by the report; and his final ratification was conclusive upon the purchaser.

Where a trustee of the court, at the time of sale, expressly declared he only sold the estate, right, and interest, which the parties to the decree had in certain land, and if they had no right he sold none, there can be no pretence of warranty; nor is it necessary in such a case, to determine whether the doctrine of *caveat emptor* applies to trustees' sales in this State.

At a trustee's sale a certain lot was represented as containing 143 acres, for which the purchaser bid $23 per acre. This is a sale by the acre, and the purchaser applying to the court within a reasonable time, would be allowed for a deficiency in the number of acres. Where the sale was made in 1812, the purchaser gave his bond, took possession, and used the property, and made no complaint about deficiency until 1818, he was held to have forfeited all claim to an allowance.

The proceedings of a trustee for the sale of real estate, acting under the appointment and orders of the Court of Chancery, cannot be investigated by a bill, filed on the equity side of the County Courts. The relief due to a party injured by such a trustee, may be obtained upon application to the Court of Chancery, under whose exclusive control the trustee acts, and

the County Courts, though courts of concurrent jurisdiction in equity matters, have no jurisdiction in such a case. The Court of Chancery cannot interfere by an original bill, where the trustee acts under the orders of the County Court.

It is a general rule as to sales under decrees of Chancery, that the purchaser always pays interest according to the terms of the decree from the day of sale, whether he gets possession or not. His getting possession is not a condition precedent to the payment of either principal or interest of the purchase money. The purchaser is presumed to regulate his bidding with a view to the known powers and rules of the court, as to delivering possession.                    PER BLAND CHANCELLOR.

A purchaser at such sale, who does not give his bond for the purchase money, nor otherwise comply with the terms of sale, for several months after the sale, and did not receive possession until he complied, must still pay the interest from the day of sale.                    IB.

A party to a suit after the court had decreed his land to be sold, cannot defeat the sale, or give a purchaser under the decree a right to object to his purchase, by making a conveyance to another person.                    IB.

Where a trustee acting under a decree to sell as much property as may be necessary to discharge debts, due from A to B, sells more than is actually necessary, a purchaser cannot be allowed to object to the sale on that account.                    IB.

In *Maryland*, the rule of *caveat emptor* applies to all judicial sales. Chancery in no case undertakes to sell any thing more than the title of the parties to the suit, and it allows of no inquiry into the title at the instance of the purchaser, or any one else.                    IB.

A purchaser at a Chancery sale is not answerable for any disposition which the court may make of the purchase money.                    IB.

APPEAL from the Court of Chancery.

The facts of this case are fully set forth in the opinion of the Chancellor, and of the judge by whom the opinion of this court was delivered.

BLAND, Chancellor, (March term, 1830.)

It appears that the late *James Mitchell* died intestate, and seized of sundry parcels of land, which descended to his six children, *Martha, Kent, Bennet, Harriet, James* and *Aquila.* That they instituted proceedings in *Harford* County Court, to have a partition made of these lands, and the estate having been found incapable of division, *William Mitchell* since deceased, to whom *Martin* had sold his in-

terest, in right of *Martin*, elected to take the whole, at the valuation. And the valuation not having been paid, *James Mitchell* and *Aquilla Mitchell*, two of the heirs of the late *James*, on the 23d May, 1811, filed their bill here, making all the heirs, and the administrator of the late *William Mitchell*, defendants. This bill brought no other parties before the court. The plaintiffs, upon the ground of their legal lien, under the act of 1786, *ch.* 45, *sec.* 9, prayed to have the land so held by the heirs of the late *William* sold to satisfy the amount of the valuation then due. The defendants answered, and on the 10th March, 1812, it was decreed, that " such part of the property in the proceedings mentioned be sold, as may be sufficient to pay the sum due from *William Mitchell* to the heirs of *James Mitchell.*" That *James Wallace* be appointed trustee to make the sale; and after proceeding in the usual form, the decree concludes in these words, "provided that the said trustee shall in the first place sell the part of the estate, clear of, and excluding the fishery, called *Cooley's Fishery*, mentioned in the answer of *Parker Mitchell*, until the further order or decree of the court in the premises."

The trustee under this decree made a full and particular report, as to the manner in which he had made the sale; among other things he says, that he had "caused said property to be laid off in lots, and sold as follows, to wit: lots nos. 1, 2, 3, 4 and 5, containing ten acres each, and lot no. 6, containing six acres, the said six lots being the whole of the tract called *Convenience*," &c. &c. "Lot no. 11, part of a tract called *Rupulta*, and known by the name of *Gover's Rupulta*, beginning for the same at the second boundary of the whole tract of land called *Rupulta*, and running thence S. 58 deg. W. 320 per. thence S. 16¼, E. 42 per. to the road leading from *Mrs. Dennison's* to *Havre de Grace*, then binding on north-west side of said road, &c. &c. &c. until it intersects the N. by W. line of *Rupulla*; then binding on the said line to the beginning, and laid out for one hundred and forty-three acres," &c. &c. That have

ing failed to sell on the 13th April, the first appointed day, he postponed the sale.

It appears, that on the 29th April, 1812, the heirs of the late *William Mitchell*, two of whom, *Edward* and *Ann*, are stated by the bill to be minors, and answered as such accordingly, by an instrument of writing purporting to have been signed by each one of them, except *Ann Mitchell*, say that "we do hereby authorise and request the said *James Wallace*, trustee aforesaid, to sell the whole of the property mentioned in the said proceedings, on the same terms as is mentioned in said decree, and we do hereby further authorise and request the honorable the Chancellor of *Maryland*, to ratify and confirm the said sale, when so as aforesaid made by the said trustee.

The trustee in his report then goes on to state, that on the 7th May, 1812, the day to which the sale had been postponed by him, he sold the several lots in succession, as numbered from one to eleven.   He says that he "then offered for sale lot no. 11, and *Freeborn Brown* became the highest bidder, and purchaser thereof, by bidding therefor $23 per acre, amounting in the whole to the sum of $3289, and the said *Freeborn Brown* now refuses to give bond for the payment of the purchase money." The said trustee further states, "that all the heirs of *William Mitchell*, and those with whom they have intermarried, except —— *Mitchell*, who is a minor, having expressed a great desire that the whole of the property mentioned in the proceedings of their suit with the heirs of *James Mitchell*, except their interest in *Cooley's* fishery, should be sold under the decree aforesaid; and the trustee foreseeing no inconveniency that could result, either to the heirs of *William Mitchell*, or the purchaser or purchasers of said property, in case the whole of the sales should not be ratified, did sell the whole of said property in the manner herein before stated." These sales of this property after the usual notice by publication, were finally ratified and confirmed by an order passed on the 15th July, 1813. Some time after the trustee

had thus made his report of the sales, *Freeborn Brown* gave his bond, with *William Brown* as his surety for the payment of the purchase money; and *Freeborn Brown* was soon after put into the actual possession of lot no. 11, as the purchaser thereof, by the trustee.

As illustrative of the nature and terms of this contract made between the court and *Freeborn Brown,* as reported by the trustee, it is worthy of remark, that it appears from the proceedings, that after lots nos. 1, 2, and 3 had been sold, lots nos. 3, 5, and 6 were sold to *William Cole,* as parcels of the tract called *Convenience.* That some time after the sales had been ratified, *Cole,* by his petition, stated that he had purchased by the acre. That *Hughes,* the purchaser of lots nos. 1, 2, and 3, claimed a part of that which *Cole* had purchased. That it had been distinctly understood, at the time of the sale, between the trustee and the bidders, that a deduction should be made for deficiency; that he had given bond for the purchase money of the lot, supposing *the tract to contain fifty-six* acres; that it had since been found that *Hughes'* lots took away two acres from *Cole's;* and that he, *Cole,* being the last purchaser, the deficiency all fell on him, the other purchaser having his lots first laid off, and he, *Cole,* having *only agreed to take the residue. Prayer,* that a deduction on account of this deficiency, at the rate per acre at which the purchase was made. Upon this petition the trustee certified, that *at the sale* it had been suggested, that the *tract called Convenience* did not contain fifty-six acres; and therefore he had declared to the bidders, and persons present, that if that tract should be found so deficient, a deduction should be made from *the last sold lot of that tract;* and that so, the facts stated by *Cole* were correct. Upon which it was ordered, on the 22d February, 1814, that a deduction be made as prayed.

The auditor, in a report bearing date on the 17th June, 1814, among other things states, that the late *William Mitchell* was represented in the pleadings as a purchaser from *Martin Mitchell,* and also of one-half of *Bennet Mitch-*

*ell's* share; and that *Parker Mitchell*, a defendant, was the purchaser of the other half of *Bennet Mitchell's* portion, and the whole of *Kent Mitchell's* share, but that there was no proof of the purchase money having been paid for those shares. That *Martin, Bennet,* and *Kent,* three of the six heirs of the late *James Mitchell,* whose interest seems to be thus materially affected by these proceedings, had not been made parties to the suit, and he therefore "submits to the chancellor, whether they ought not in some shape to have notice of the complainants' application, and the allega-- tions of the defendants." Upon which on the 22d July, 1815, it was "ordered, that the claims against the said es- tate (of the late *William Mitchell,*) which are now or may be exhibited, be decided on during the sitting of the ensu- in July term, on application." And this order was direct- ed to be published, and was published accordingly. After which the auditor, on the 27th February, 1816, made a statement of the distribution of the proceeds of sale, in which he has, as he had before reported, considered the late *William Mitchell,* and the defendant, *Parker Mitchell,* as the assignees of *Martin, Bennet* and *Kent;* and after hav- ing awarded to each of the other heirs of the late *James Mitchell* one-sixth of the valuation, has distributed the balance of the proceeds in equal portions, among the heirs of the late *William Mitchell.* Upon which, on the 29th February, 1816, the chancellor said, "notice having been given as directed by the order of 22d June, 1815, and no application having been made in support of the objections suggested in the first report, and the auditor having appro- priated the proceeds by the within statement and report, the same are confirmed, and the proceeds are directed to be applied accordingly, with interest on the commission and dividends, in proportion as it has been, or may be received.

The bond given by *Freeborn Brown* for the purchase money having become due, and not having been fully paid, was put in suit by the trustee, *James Wallace,* in *Harford County Court,* and judgment obtained on it against *Free-*

*born Brown,* and his surety *William Brown.* From which an appeal was taken, and the judgment was affirmed in June, 1817; and on the 18th January, 1818, *Freeborn Brown,* as he alleges, paid a part of the debt. After which *Freeborn Brown* and *William Brown,* on the 8th May, 1818, filed their bill in *Harford* County Court against the trustee of this court, *James Wallace* alone, by which they prayed for, and obtained an injunction. On the 17th August, 1824, they filed their supplemental bill. On the 20th of the same month, *Kent Mitchell* was allowed to come in as a defendant. After which, on the 5th March, 1825, *Freeborn Brown* and *William Brown* filed another bill in *Harford* County Court, against this court's trustee, *James Wallace* alone. All these bills were answered, and the motion to dissolve the injunction was overruled. On the 13th March, 1826, *Freeborn Brown's* death was suggested, and *Mary B. Brown,* his executrix and devisee, was admitted as a plaintiff in his stead. After which these cases were removed to this court, and the proceedings all filed here, on the 8th May, 1827.

The parties having agreed that the two cases should be heard together and consolidated, and there being a convenience in having them so associated; and as it may prevent confusion, and save repetition, I shall therefore treat them as one suit; and that no equity, nor any real ground of relief may be lost to the purchaser, I shall consider all that is alleged in these several bills, as if it had been regularly introduced into the original case here by a petition, in which every thing stated in those bills had been fully set forth. And I shall then consider whether these bills, filed in a court of concurrent jurisdiction, ought not to be dismissed, even supposing they had presented a fit subject for equitable relief, because of their being incompatible with the proceedings of this court.

The first position assumed by the purchaser is, that he did not obtain possession until several months after the day of sale; and therefore, so much of the judgment against

him, as gives interest from that time, is against equity, and ought not to be allowed.

It is a general rule, as to sales under decrees of this court, that the purchaser always pays interest according to the terms of the decree, from the day of sale, whether he gets possession or not.  His getting possession is in no case allowed to be a condition precedent, to the payment of either principal or interest of the purchase money.  The purchaser is presumed to regulate his bidding, with a view to the known powers and rules of the court, as to delivering possession.  There is, therefore, nothing in this objection, even supposing this purchaser himself to have been in no default; and by promptly giving his bond, to have clothed himself with an equity to demand a delivery of possession immediately after the sale had been finally ratified.  But looking to his evasion or negligence, this objection comes with an ill grace from him.  *Tyson vs. Hollingsworth*, 1808.

The next position assumed by this purchaser is, that because the heirs of the late *William Mitchell* have, since he bought, sold a part of the same land he purchased, to *Carvell* and *Charles Cooley*, by a deed dated on the 14th September, 1815, that therefore he should not be compelled to pay the purchase money.

Of this however there is no clear proof, but suppose the fact to be so, it would be strange indeed if any party to a suit, after the court had decreed his lands to be sold, should be able to defeat the sale, or could afford to the purchaser a sufficient reason for not paying the purchase money, by merely making a conveyance of the land to some third person, so as to give such third person a pretext of title, on which to bring suit against the purchaser from the court. It is clear, that the whole title of the heirs of the late *William Mitchell* to the lands embraced by the deed of the 14th September, 1815, was sold by the trustee; or that it was not.  If it was sold, then the subsequent purchaser from those heirs, can have no title; and the title of the purchaser, under this court's decree, cannot in this respect be

impeached. If on the other hand, their title to the lands described in that deed was not sold by the trustee to *Freeborn Brown*, then he has nothing to complain of, and the whole affair is entirely foreign to the matter now under consideration. This objection is therefore utterly groundless.

Another point upon which this purchaser rests is, that he bought by the acre, and that the trustee represented the tract which he, *Brown*, bought, called *Gover's Rupulta*, as containing one hundred and forty-three acres, when in truth it did not contain quite one hundred and twenty-seven acres; and therefore, that he ought to have a deduction to the amount of this deficiency. It is not alleged that the deficiency is in that part of the lot, which was the inducement to the purchase, or that it is of such a nature as materially to vary the contract. It is merely a claim for an allowance on account of short measure; as if by the terms of the contract, a measurement was absolutely necessary to reduce it to certainty, and to ascertain the amount of the purchase money to be paid.

The position here taken rests upon an assumption of fact, that the land was sold only by the acre; or in lots of an indefinite size, at twenty-three dollars an acre. But according to the trustee's report, such was not the fact; and there is no satisfactory proof that it was sold in any other manner, than as there stated. In the absence of all proof of mistake, misrepresentation, or fraud, the ratified report of the trustee is the only evidence of the contract by which the court can allow itself to be governed; and unless it be so impeached, it must be considered as conclusive upon the subject. It is stated by the trustee, that he caused the lands to be laid off in several distinct parcels, described by metes and bounds, and number of acres; and that he sold them in that manner; each parcel as a separate body of land, for an amount ascertained by the number of acres, said to be contained within the specified metes and bounds, and not by the acre alone; or in lots Nos. 1, 2, 3, &c. of an indefinite

size, without reference to boundary, or other more particular description, at so much by the acre, so as to render a measurement indispensably necessary, to ascertain the amount of the purchase money. That these several parcels of land were sold by the tract, and were distinctly understood to be sold in that manner by all the bidders present at the sale, is clearly shown by the explanations in relation to lot no. 6, which was sold by the acre, as a *residuum* of the tract called *Convenience:* but all the other lots, from no. 1 to no. 11, were sold by the tract; all of them lying within certain specified metes and bounds, made known to the bidders at the time of sale. After thus describing one of those lots, the number of acres is specified, with the usual reservation, "more or less," and lot no. 11, after being so described, is said to have been "laid out for one hundred and forty three acres;" and in each case the purchase money is summed up, and the purchaser is reported as having agreed to give a designated sum total. What is meant in general by the phrases, "more or less," or "laid out for so much," in conveyances of land, in reference to quantity, seems to remain as yet unsettled. The *Proprietary* instructions fixed it, as a rule for the land office, as to grants from the State, that they should be allowed to cover no more than ten per cent.; but there has been no rule established as to other grants, or conveyances. *Land. H. A.* 253. *Townshend vs. Stangroom,* 6 *Ves.* 340. *Winch vs. Winchester,* 1 *V. and B.* 375. 1 *Pow. Cont.* 375. *Anderson vs. Foulke,* 2 *H. and G.* 358.

There is, however, no direct and satisfactory proof of any deficiency in lot no. 11, as described and sold. It is not shown that the boundaries by which the trustee sold that lot, do not embrace the whole number of acres which they were said to contain. I am therefore of opinion, that this purchaser has failed to sustain this claim, for an allowance for deficiency; in the first place, because the land was sold to him by the tract, and not by the acre; and in the next place, because, in point of fact, he has thereon no deficiency within the designated boundaries.

This purchaser, *Freeborn Brown*, however, advances still further; he prays to have the whole sale rescinded, and to have so much of the purchase money as he has paid returned to him: and this he asks upon two grounds—first, that although the decree of the 10th of March, 1812, restrained the sale, to so much only as should be sufficient to satisfy the claims therein mentioned, yet the trustee made sale of the whole of the interest of the heirs of the late *William Mitchell,* by virtue of a pretended power, dated 29th April, 1812, from those heirs, to sell the whole, when in truth several of them were minors, and incompetent to give any such power to sell; and that the sale was ratified by the chancellor, under a mistaken impression that those heirs were of full age, and able to convey; so that this lot no. 11, was disposed of, which otherwise would not have been sold.

The position here assumed, is in direct opposition to the express terms of the decree; of the trustee's report; and of the instrument of the 29th of April, 1812. There is nothing upon the face of those documents, taken either separately or together, by which the position can be sustained. But *Freeborn Brown* must, in this respect, take upon himself one of two characters. He must stand either as a purchaser, under what he calls the power of the 29th April, 1812; or as a purchaser under the decree of this court. He cannot blend the two, and take advantage of both at the same time. If he bought under the power, then he is a purchaser direct from the heirs of the late *William Mitchell,* and this court has no jurisdiction of the matter in any way whatever, in this case. Those heirs in that respect, were not under the control of this court. They were entirely free to sell any right, or interest of theirs, as they might think fit, either in person, or by *James Wallace* as their attorney. But it is perfectly evident, that they could not, by giving a power of attorney to *James Wallace* to sell for them, who was also at the same time acting as the agent or trustee of this court, thereby mingle any of their separate

interests with that subject, with which the court was then dealing. They could not thus, uninvited, thrust *their* own individual interests into a cause, which was under the direction of the court for the benefit of others, as well as themselves. Therefore, in this view of the matter, the instrument of the 29th April, 1832, must be considered as entirely foreign to the matter under consideration. *Weems vs. Brewer*, 2 *H. and G.* 397.

If on the other hand, *Brown* takes his stand as a purchaser from the court, then on recurring to the decree, and trustee's report, it will be seen, that the decree covers the whole subject, and that the trustee has confined himself strictly within the limits of the decree. The bill had stated, that two of the heirs of the late *William Mitchell* were minors, and they had answered as such. The trustee had again incidentally reminded the chancellor, that one of them at least, was then a minor, in that part of his report in which he speaks of their desire to have all the land sold. After this it seems strange to object, that the chancellor had ratified the sale under a mistaken impression, that all those heirs were of full age. On the contrary, it is manifest from beginning to end, the chancellor was perfectly aware that he was dealing in the property of infants. There could have been no mistake in this particular. But it is said, that the instrument of the 29th April, 1812, induced the court to sanction the sale of the whole, which it otherwise would not have done. But the court had previously decreed the sale of the whole; and no more having been sold than was authorised by the decree, the ratification of the sale certainly could not be objected to on that account. It has long been the course of the court, to ratify sales at once, with the consent of all concerned; and the instrument of the 29th April, 1812, in reference to that practice, merely indicated that there would be no opposition to a ratification from those parties. But it is the daily habit of this court, for convenience, to carry to market, property which, in a subsequent part of the cause, perhaps it would have been unnecessary to sell.

Looking at its own powers of setting right the interests of all parties as among each other, the court often directs real estate to be sold, before it can know the real situation of the personal estate. And even supposing it to be true, that the instrument of the 29th April, 1812, had an influence upon the trustee, and the chancellor, in making, and in finally ratifying the sale, they were certainly right in thus consulting the convenience of the parties. And if in truth, more had been improperly sold than was absolutely necessary to meet the purposes of the suit; it is clear, that a purchaser cannot be allowed to come in, and object to the sale on that account. *Lloyd vs. Johnes,* 9 *Ves.* 65. *Lutwynch vs. Winford,* 2 *Bro. C. C.* 249. I am therefore of opinion, that the validity of this sale to *Freeborn Brown,* cannot be affected by any thing that has been shown on this ground.

This purchaser asks a recision of the sale in the next place, upon the ground, that suits have been instituted in which it is alleged, and appears, that neither the late *James Mitchell,* the ancestor of the two plaintiffs, nor the late *William Mitchell,* the ancestor of the defendants, in the decree under which the land was sold, had any title to it; and that in one of those suits, an action of ejectment, a judgment had been rendered against the casual ejector, and *Freeborn Brown,* had been actually turned out of possession; and therefore, as the court cannot make to this purchaser a good title, he ought not to be compelled to pay the purchase money.

In *England,* it seems, that when lands are decreed to be sold, the court, in most instances, undertakes to sell a good title; and therefore it is common in such cases, to make a reference to a master, to see whether a good title can be made or not, to the purchaser, who will not be compelled to take a doubtful title. *Marlow vs. Smith,* 2 *P. Will.* 198. *Shaw vs. Wright,* 3 *Ves.* 22. *Coop. Rep.* 138. In *Maryland,* the course has always been different. Here, as to all judicial sales, the rule *caveat emptor* applies. *Ridgely vs.*

*Gartrell,* 3 *H. and McH.* 450. *The Monte Allegre,* 9 *Wheat.* 644. *Finley vs. Bank U. S.,* 11 *Wheat.* 307. The court in no case undertakes to sell any thing more, than the title of the parties to the suit; and consequently, it allows of no inquiry into the title, at the instance of a purchaser, or any one else. The court makes no warranty, of any kind, of the title sold by its trustee, and therefore cannot listen to any objections as to defect of title, or be involved in any inquiry into its validity. The operation of this general rule is, in many respects, mutually beneficial; for as on the one hand, the court, by selling only the title of the parties to the suit, and giving no warranty, involves itself in no expensive, dilatory, and troublesome inquiries, into the validity of the title; so on the other hand, the purchaser is not answerable for any irregularity of the court, nor for any disposition which it may make of the purchase money, and has a right to presume, that the court has acted correctly in decreeing a sale. But as the court offers, and he takes no more than the title of the parties to the suit, it is his duty to see, that all who have an interest in the property, and whose rights ought to be bound by the decree, have been made parties to the suit for that purpose; and have been so concluded by the decree under which he buys. And it is also necessary for the same reason, that the court sells only the right of the parties to the suit, that the purchaser should ascertain for himself, whether or not, the title of those parties may not be impeached, or superseded by some other and paramount title. For he has no right to call upon the court to protect him from a title not in issue in the cause, and no way affected by the decree. 2 *Belt. Supp. to Ves.* 101. 1 *Eden.* 19. *Gifford vs. Hoit,* 1 *Scho. and Lef.* 386. *Bennett vs. Hamill,* 2 *Scho. and Lefr.* 577. *Lloyd vs. Johnes,* 9 *Ves.* 65. *Curtis and Price,* 12 *Ves.* 105.

Here I might stop and pronounce a final decree, that these bills be dismissed. But as it has been urged that the *Harford* County Court, although clothed with power in all respects equal, and concurrent with this court, had in effect,

no jurisdiction of this matter; because it was merely a branch of a suit then depending here; and because the prosecution of these suits in that court thwarted, and was incompatible, with the regular progress of the suit here, embracing the same subject.

It is obviously necessary for the public good, that the several courts of justice of our system, should never allow themselves to be brought in collision with each other. And in general, they are so well ordered as to all matters of common law, that they cannot cross each other in any way whatever. Unfortunately however, the sphere of each one, having concurrent equity jurisdiction, has not been so well described as to prevent occasional interferences, even where there exists the most decided intention in each, to confine itself strictly within its own orbit.

Soon after I came here, I was made sensible of the necessity of great care, and vigilance, in order to steer clear of any collision with my co-ordinate neighbors; and yet have not been able to do so upon all occasions, because of the facts of the case not having been fully disclosed in the first instance. In a case, where the plaintiff merely represented, that he had become the debtor of the defendant by bond, on which judgment had been obtained at law, without giving him all the credits to which he was equitably entitled, I granted an injunction to stay the proceedings at law. But on its being clearly shown by the answer, that the plaintiff at law, was suing there on a bond he had taken as trustee, under a decree of a County Court of Equity, I not only dissolved the injunction, but dismissed the bill with costs, on the ground that the proceedings on the bond, were properly, a branch of a suit, depending in another court of equity, with whose movements this court ought not to intermeddle. But on another occasion, where I had passed a decree for the payment of a sum of money, and the party had sued out a *fieri facias,* a County Court granted an injunction to stop the further proceedings upon the *fieri facias.* In that case the collision was palpable and direct.

I determined however to submit; and without pressing the conflict, which could have been attended with no good effect, to leave the error to be corrected by the County Court itself. The recollection of these circumstances, has suggested the propriety of explaining my views upon this subject, more fully than might otherwise have been considered necessary.

It has been thought by some, that where any one court of competent authority, had in any manner expressed an opinion on a subject, every other court having no more than a concurrent jurisdiction, was thereby precluded from taking cognizance of the same matter. But it is believed, that the general rule is not so entirely comprehensive. It is certain that a judgment or decree, upon any matter put in issue between the same parties, in relation to the same subject, is a complete bar to any subsequent suit for the same matter.

So too, after a suit has been instituted, and is then depending in any court of competent jurisdiction in this State, though it is not so with regard to a suit in a foreign court, no other suit can be maintained for the same subject between the same parties. *Bowne vs. Joy,* 9 *Johns. Rep.* 221. *Walsh vs. Durkin,* 12 *Johns. Rep.* 99. And even if the one suit be brought in a court of common law, and the other in equity, to prevent so duplicate vexation, the Court of Chancery will put the plaintiff to his election, and compel him to abandon the one suit or the other. These rules can only apply where the parties and the subject are the same in both suits; but if there be any essential differences between the two, either as to parties or subject of controversy, as in the cases under consideration, other reasons and principles apply.

It has been said, that where an injunction had been refused by the chancellor, it could not be granted by a County Court, upon the same case, or the reverse. This opinion seems to be sufficiently well founded, if referred to a case in which the first bill is actually depending at the time,

when the second application is made to the co-ordinate court; or where, on hearing of the parties or by default, the one court has refused, or dissolved the injunction upon the same case, in which an injunction is asked for in the other court. Because if all that had been done in the one court, was to go for nothing in the other, a party might in every instance, as a matter of course, avail himself of all the delay to be had in the one court, and then take advantage of the identical same means of procrastination in the other court, after a solemn judgment had been pronounced upon his case, without resorting to the regular course of setting that judgment right. *Reynolds vs. Pitt*, 19 *Ves.* 138.

But an injunction is, in its effects and consequences, in many respects, analogous to a prohibition. The object of an injunction is to protect the citizen from harm, by acting upon the person complained of. The same object is in many instances, intended to be accomplished by a prohibition, which acts immediately upon the inferior tribunal; and yet the party may apply to each one of the superior courts in succession, for a prohibition, and his *ex parte* application having been refused by one, is of itself, no ground for its being rejected by any other of them. *Smart vs. Wolff*, 3 *T. R.* 340. *For. Rom.* 56. I therefore do not see why, upon the same principles, a citizen might not be allowed to take his chance by a first *ex parte* application, of obtaining an injunction from each one of the courts, having jurisdiction of his case, in like manner as he is allowed to apply to each one for a prohibition, without prejudice, from having been refused by another of them; particularly as the *Statute 4 Ann, ch.* 16, *sec.* 22, does not require an injunction bill to stay waste, or proceedings at law, to be filed before the *subpœna* is issued.

Under our government, the Federal courts, and the State courts have, in many instances, a concurrent jurisdiction; and either may have cognizance of the case, either as a court of common law, or of equity. If the plaintiff and the defendant be citizens of different states, the suit may be

brought in either; but if the suit be instituted in a State court, its proceedings will not be staid by an injunction from a Federal court, or the reverse, not because the court has not jurisdiction of such a subject between those parties, but because it could not exercise its jurisdiction in that case without bringing itself injuriously in conflict with another tribunal, with whom it ought not on any account to interfere. *Diggs and Keith vs. Wolcott*, 4 *Cran.* 179. *McKim vs. Voorhies*, 7 *Cran.* 279.

The two great co-ordinate courts of equity in *England* are, the high Court of Chancery, and the Court of *Exchequer.* The first is the prototype of this court. The Exchequer, as a phrase is, has two sides, it is a court of common law, as well as of equity. It is composed of a plurality of judges, and is in all respects *a term court;* being in these particulars essentially different from the Court of Chancery, which is composed of only one judge, and is most emphatically *always open.* The Exchequer, like our Federal Circuit Courts, and our State County Courts, is so organized that it can exercise scarcely any of its equity powers, except in term time; and owing to the delays, and expense of proceeding with its equity business, only from term to term, the continually open Chancery Court has a most decided advantage over the Exchequer, which on that account is almost deserted as a court of equity. *Crowley's case,* 2 *Swan.* 11. 1 *Lond. Jurist. Art.* 7. In this and other respects, the analogy between the high Court of Chancery, and the Court of Exchequer of *England,* as co-ordinate courts of equity, and the high Court of Chancery, and the County Courts of *Maryland,* as co-ordinate courts of the same description, is so close and striking, that the cases in relation to the conflicts of jurisdiction between those *English* courts, may be applied, as most instructive illustrations of the effect of any similar clashing, between our own co-ordinate courts of equity. It is a rule between those *English* courts, that where they have both an entirely concurrent jurisdiction of the same matter, that court is entitled to retain the

suit, in which it has been first commenced. There are some early instances of disputes between those tribunals, in which the one has issued its injunction against the officers of the other. But latterly, there is no instance, of either having enjoined a party from a proceeding in the other. That court in which the suit has been last instituted, or in which the proceedings are least comprehensive, and perfect, has in general given way to the other; or forced the parties to betake themselves to that court, in which the suit was first instituted, or where the most perfect proceedings are then depending. But after a bill to redeem a mortgage has been filed in one court, a bill to foreclose may be brought in the other—and a cross bill may be filed in Chancery, to an original bill in the *Exchequer*. And so too, either court will retain its suit, when the bill in the other has been dismissed. *Nelson*, 19. 1 *Vern.* 220. *Pre. Cha.* 547. *Amb.* 613. 3 *Desau.* 219. 3 *Swan.* 698. 1 *Jac. and W.* 232. 4 *Md.* 204. 6 *Md.* 115. But there is no instance to be met with, in which, either one of the *English* courts has even attempted to hinder, or stay any part of the proceedings in a suit, which had been rightfully instituted, and was then progressing in the other; as by enjoining a trustee proceeding in the direct execution of a decree; or staying a proceeding by execution to enforce the payment of money, decreed to be paid; nor has it been even intimated, that either of those courts would call before it the parties to a suit depending in the other, to give an account of acts done under the authority of the other; or to have the money, or property, with which the other was dealing, or which was in the hands of its officers or agents, brought in to be there disposed of by itself. Yet all this should have been considered, and adjudged, as settled and correct, as between those *English* courts, in order to sanction, by mere analogous authority, what appears by these proceedings to have been done by the County Court of *Harford*. From these proceedings it appears, that there never has been before that court, any defendant, who had in reality, any

thing more than a bare *pro forma* interest in the matter
in controversy: for I put out of the question *Kent Mitchell,*
of whom the plaintiffs made no complaint, and did not
charge as a party. *James Wallace,* the defendant to these
bills, was no more than an agent of this court, who might
have been removed at its pleasure. He had no interest of
his own in the matter. Had he been removed, there would
then have been no one against whom that court could have
proceeded with effect; or had he been permitted to remain,
no decree against him alone, could have bound the rights
of the real parties to the original controversy, who were no
parties to the bills in *Harford* County Court. Had *James
Wallace,* as trustee, collected any money, as the proceeds
of the sale he made under the decree of this court, that
court could no more have ordered it to be brought in, and
paid over, than it could have taken money levied, and held
officially by a sheriff of an adjacent county, under an execu-
tion from his own County Court; or money held officially,
by the messenger, or register of this court. *Jaques vs.
Gregg,* 1807. If *Harford* County Court could not have
exercised powers to the whole of this extent, it is evident,
that the bills which that court allowed to be filed, and re-
quired to be answered by *James Wallace,* the trustee of
this court, should have been dismissed at once. Those pro-
ceedings are not only incompatible with, and calculated to
cross, and thwart the proceedings of this court, but they
were absolutely useless, and needlessly troublesome; be-
cause it is manifest that they could have resulted in no
effectual relief; and because this court could have reached,
in the most efficient manner, all the objects aimed at by
these bills, much more expeditiously, and at far less ex-
pense. Of all this, had this case been brought to a final
hearing before *Harford* County Court, I am satisfied, it
might and would have been convinced, and upon that con-
viction, would without hesitation have dismissed these bills.
And therefore, without revising, or reversing any thing,
which has been heretofore done by that court, I am of

opinion, that in consolidating, and dismissing these bills, I do no more than would have been done by that tribunal, as well upon the merits, as upon the ground of incompatibility of the proceedings, with the suit now depending in this court.

Whereupon it is, on this 5th day of July, 1830, adjudged, ordered, and decreed, that the said several bills of complaint, filed in *Harford* County Court, by the late *Freeborn Brown*, and the said *William Brown*, be, and the same are hereby consolidated, and treated as parts of the bill, filed on the 5th day of March, 1825, as if the same had been filed on the 8th day of May, 1818. And it is further adjudged, ordered, and decreed, that the injunction heretofore granted in this case, be, and the same is hereby dissolved, and that the bill of complaint of the said complainant, as herein before consolidated, be, and the same is hereby *dismissed with costs*.

From this decree, the complainants, *Mary B. Brown*, executor and devisee of *Freeborn Brown*, and *William Brown*, appealed to this court.

The cause came on to be argued before BUCHANAN, Ch. J., and MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Mayer*, and *Kennedy* for the appellants, contended,

1st. That *Freeborn Brown* as purchaser at the sale made by *James Wallace*, trustee, was not obliged to take the title which the said *James Wallace* pretends to have offered: But on the contrary, the said *Freeborn* had good right to refuse to pay the purchase money, and accept such title, because:

1. The title to the said land was in dispute, and claimed by two branches of the *Gover* family, both of which branches had good pretensions to the said land, and one of whom, to wit, *Robert Gover*, actually recovered the said land by the neglect of the heirs of *William Mitchell* to defend it.

2. Because the said title was claimed by *Samuel Gover*, an original grantor of the said land, and who had filed pro-

ceedings in Chancery for a reconveyance of the same against the heirs of *William Mitchell*, in which proceedings it is affirmed, that the original conveyance of *Samuel Gover* was intended as a mortgage, and fraudulently drawn as an abso-lute deed, which proceedings were still pending in the Court of Chancery, and which, if true, would entirely defeat the title of the heirs of *William Mitchell*.

3. Because the heirs of *William Mitchell* themselves, (supposing there was no claim or right on the part of either of the *Gover* family,) had no other title to the land sold, except such as *William Mitchell* had, and which was nothing more than an equitable title in the land, derived from a contract to purchase of *Martin Mitchell*, (the eldest son of *James*,) his right of election under a statutory division of the land of *James Mitchell*, and for which no money was paid by the said *William Mitchell*. And that therefore the heirs of *William Mitchell* were not able to make a good legal title to *Freeborn Brown*.

4. Because a purchaser at a Chancery sale is not bound to accept a defective or doubtful title, as this is admitted by the chancellor's decree to be.

5. Because the part purchased by *Freeborn Brown* at the sale in the proceedings mentioned, was not sold in virtue of the decree, but by a private authority from certain heirs of *William Mitchell*, two of whom were minors, and incapable to give authority to sell, and that therefore, a *fortiori*, do all the above objections to defective title apply.

2d. That the chancellor erred in his judgment, where he said that his land was not sold by the acre, and therefore that *Freeborn Brown* was not entitled to a deduction on account of short computation.

3d. That the chancellor erred in deciding that *Freeborn Brown* was not entitled to have the contract rescinded, when it appeared that the *Mitchells* had subsequently sold some of the same land to the *Cooleys*, more especially as this sale to the *Cooleys* interfered with the right of *Free-*

*born Brown* to take possession to the water, where he had a valuable fishery.

4th. That the chancellor erred in not sending the controverted questions of location in this cause to be determined by a jury, his omission to do so being founded on an opinion, that the defendant in the cause was not answerable for any deficiency in the quantity of the land.

5th. That the chancellor's decree is altogether erroneous for dismissing the injunction in these causes, and for refusing the relief prayed.

On the *first* point they cited, 3 *Merr.* 53, 140, 248. 2 *Ves. and B.* 145, 149. 2 *P. Wms.* 201. 3 *Ves. Jr.* 22. 14 *Ves.* 205, 129. 17 *Ves.* 279. 16 *Ves.* 274. 8 *Ves.* 428. 5 *Ves.* 647. 1 *Des.* 382, 486. 4 *Des.* 126. 3 *Munf.* 317. 1 *Hopkins,* 436. 3 *Bibb.* 317. 6 *Harr. and Johns.* 258. 1 *Stark. Rep.* 65. 1 *Esp. Rep.* 115, 216. 1 *Bro. Ch. C.* 75, 148. 1 *Taunt.* 430. 4 *Ib.* 334. 4 *Johns. Ch. R.* 536. 2 *Johns. Rep.* 490.

On the *second,* they referred to 5 *Johns. Ch. C.* 180. 4 *Ib.* 85. 1 *Ves. Jr.* 210. 2 *Ves. Sr.* 100.

*Gill,* and *Alexander* for the appellees.

1. The bill states, that the title is defective in several respects, but as the title supposed to lie in *William Mitchell,* is not one of the grounds upon which the bill relies, the complainants are not at liberty to show any such defect by evidence, as the relief must be according to the case made by the bill.

2. The sale to *Brown,* the purchaser, was made by the trustee in virtue of the decree, and was warranted by it. The authority from the heirs of *William Mitchell,* does not profess to confer on him any independent power to act as their agent; but is nothing more than evidence of consent on their part, that a further sale to be made by him as a trustee, shall be ratified by the chancellor. The report of the trustee states this to have been the character of the instrument, and as the purchaser was a party to these proceed-

ings, he is concluded by them, at least so far as not to be allowed to countervail them by parol.    The bill moreover, is filed against *Wallace,* as trustee, and not against him and the heirs of *William Mitchell,* as it should have been, if he was regarded as merely their private agent.

3.  But the sale being a judicial sale, the rule *caveat emptor* applies, and the purchaser is not entitled to relief, though he succeed in proving the title to be defective.  9 *Wheat.* 616.  2 *Harr. and Gill,* 358.    If, however, the rule was the reverse in ordinary cases, the purchaser, under the circumstances of this case, would not be entitled to be relieved from his contract.    He has slept upon rights, if he had any, for more than twelve years.    He cannot therefore object, either to the supposed invalidity of the title, nor allege that the trustee exceeded his authority.    The heirs would not, after such a lapse of time, be permitted to urge this objection to vacate the sale; neither can the purchaser, who has been in possession of the property during the whole period, using and cutting the timber, and consequently depreciating its value, for his own emolument.

A purchaser will not be allowed to say, that more property has been sold than was necessary to answer the purposes of the decree. 2 *Bro. Ch. C.* 248.   1 *Madd. Ch. Pr.* 443. 2 *Fonb.* 149.   *Sug. Ven.* 35.   Nor will an objection upon this ground be listened to, after the sale has been ratified.   1 *Ball. and Beat.* 501.

It has been said, that one of the parties was an infant at the time of sale.    But if this were so, and the objection was a good one, it does not follow that the infancy continued until the period of the ratification.    Chancery, however, can bind the rights of minors.   *Powell vs. Powell,* 6 *Madd. Rep.* 41.

*Cooley's* fishery does not appear to have been sold, though if it was, as the chancellor had by the decree reserved the powers to do so, and his ratification is equivalent to an order for that purpose, the sale cannot be rescinded upon this ground.

Even in *England,* the Court of Chancery does not warrant the title, though it has it investigated by the master. 3 *Merr.* 223. 2 *Sch. and Lef.* 577. 1 *Madd.* 443. And there too, a purchaser may waive all objections to the title, which waiver may be inferred from circumstances; such as delay or acquiescence. *Sug. Vend.* 161. 2 *Madd. Ch. Pr.* 402. 2 *Merr.* 103. 2 *Cox.* 363. *Ib.* 394.

4. *Harford* County Court, as a Court of Equity, had no jurisdiction over the subject of this suit. The decree was originally in the Court of Chancery, and the proceedings in this case were transmitted from *Harford* County Court, under the act of 1824, *ch.* 196. The high Court of Chancery having jurisdiction over the subject of the controversy, before the application to the *Harford* equity jurisdiction, the latter had no power to interfere in the proceeding, at any stage of it; nor in any way to inquire into, or obstruct, the conduct of the officer appointed by this court. 1 *Pr. Wms.* 745. 2 *Peters' Cond. Ch. Rep.* 253. *Richardson vs. Jones,* 3 *Gill and Johns.* 163

MARTIN, J., delivered the opinion of the court.

The first question presented in the examination of this case, is to ascertain the true character of the sale made by *James Wallace* to *Freeborn Brown,* of the land in dispute, lot no. 11, part of a tract called *"Rupulla."* Whether it was made by him in his character of trustee, under the decree of the Court of Chancery, or as agent for the heirs of *William Mitchell.*

It is stated in the bill, that this sale was made by *Wallace,* not in his character of trustee, but as the private agent of *Mitchell's* heirs, and this allegation is expressly denied by *Wallace* in his answer. He says he did not sell the land to *Brown* exclusively, in virtue of the power and authority given him by the heirs at law of *William Mitchell,* as stated by the complainants; but that he sold the same *under the decree of the Chancellor.* That although the decree directed him to sell so much of the real estate of *William*

*Mitchell*, deceased, as was necessary to pay the claim, or debt due to the heirs of *James Mitchell*, yet he never conceived himself to be restricted by said decree to the exact amount, particularly as it was impossible almost, that a sale could be made of such part of the lands as would just pay said claim, and no more.    He avers, at the time of the said sale, he did not know how much the claims of the heirs of *James Mitchell* amounted to, nor did he know at that time, what the costs of the proceedings in the said suit, between the said *Mitchells*, and the costs for selling the said lands would amount to.    He admits, at the time he sold the said land to the said *Brown*, he was under the impression, that he had sold as much, exclusive of the sale to the said *Brown*, as would pay the claim mentioned in the said decree, provided the other persons who had purchased the land sold by him, under the said decree, complied with the terms of sale which they had not done at the time he made the sale to *Brown;* but he denies, that he knew he had sold a sufficiency for the purposes of the decree, and states, that the power or authority derived from the heirs of *William Mitchell*, was obtained for the purpose of showing that they were satisfied with the sale, and not because he (*Wallace*) knew he had already sold a sufficiency for the purposes of the decree, and that he had no further power to sell.

This answer is responsive to the allegations in the bill, and must prevail of itself, unless defeated by the testimony of two witnesses, or one with pregnant circumstances.    It does not however stand alone, but is powerfully supported by other evidence in the record.    The language of the paper signed by the heirs of *Mitchell*, shows their intention, and their understanding of the transaction.    After stating that the Court of Chancery had passed a decree, that such part of the property, as should be sufficient to pay the sum due the heirs of *James Mitchell*, should be sold in the manner, and on the terms maintained in said decree, and did appoint *James Wallace*, to make sale thereof; they say, being desirous that the whole of the property mentioned in

the proceedings, should be sold in the *same manner*, and on the same terms, as mentioned in said decree, they authorise and request the said *James Wallace*, trustee aforesaid, to sell the whole of the property, on the same terms as is mentioned in the said decree, and we do hereby further authorise and request the honorable the chancellor, *to ratify and confirm* the said sale when so made as aforesaid, by the said *trustee.* In every part of this writing *Wallace*, when referred to, is considered as acting as trustee; and not as the private agent of the heirs of *William Mitchell;* and in the last clause, it is expressly stated, the sale is to be made *by the said trustee.* If this was a private sale by the heirs of *William Wallace*, what control had the Chancellor over it, and upon what ground could he be called on to ratify and confirm the sale, unless made by a trustee, under his decree? Again, if this was a sale made by the heirs of *Mitchell*, by *Wallace* as their private agent, the bond for the purchase money ought to have been given *to them*, and not to *Wallace*, and when paid, the deed to the purchaser must be executed by the heirs, and not by their auctioneer. *Wallace* could only have authority to take the bond to himself, and when paid, to execute a deed, when the sale was made by him as trustee, under the decree of Chancery. By a reference to the receipt passed by *Wallace* to *Brown*, dated 16th November, 1812, we find, the bond for the purchase money was given to *Wallace*, and he obligates himself to execute a deed to the purchaser upon the payment of it. And this receipt is signed, "*James Wallace, trustee.*" This paper clearly imports, *Wallace* made the sale as trustee under the decree of Chancery, having first obtained the consent of *Mitchell's* heirs for so doing.

To oppose this answer on oath, so strongly corroborated by the acts of the parties themselves, appearing from the written evidence, is presented the testimony of some witnesses who were present at the sale. *Thomas Brown, Robert Gover*, and *Bennet Barnes* testify, that *Wallace* said

he sold it, by virtue of an authority from the *heirs of Mitchell. George Bartol, Andrew Rhodes,* and *Abraham Jarrett,* were also present at the sale.   *Bartol* says, he does not recollect he heard *Wallace* say he had no authority to sell more.   *Rhodes* did not hear him say he was authorised by the heirs to sell more, and *Jarrett* says, he does not recollect, *Wallace* said, under what authority he sold.  This testimony is variant, and does not sustain any one statement of facts, and it must be recollected, this took place at the bustle of a public sale, and therefore, may not have been accurately remembered by persons not interested in the sale. But take the whole transaction together, may it not fairly be considered as supporting the statement, that appears from the written evidence before referred to.   That *Wallace,* having sold lot no. 10, thought he had enough to pay the claim, but at the request of the heirs, and having obtained from them their assent in writing, he proceeded to sell lot no. 11, in the same manner as he had sold the other lots.

It has been contended, if the sale was made by *Wallace,* as trustee under the decree aforesaid, yet the sale was not binding on the purchaser, because he exceeded the power conferred on him by the decree.   That by the decree, he was authorised to sell only so much land as was necessary to discharge the claim against the heirs of *William Mitchell,* and that therefore, after the sale of lot no. 10, if that produced a sufficient fund to discharge the claim, his power ceased, and the purchaser was not bound by the subsequent sale of lot no. 11.

This is not a new question, and will be found to be substantially settled in the case of *Lutwych vs. Winford,* 2 *Bro. Ch. R.* 249.   See also *Lloyd vs. Johns.* 9 *Ves.* 65. But we deem it unnecessary to enter into a full investigation of this doctrine, because neither *this question,* nor whether *Wallace* sold as trustee, are now open for inquiry. Upon the application to the chancellor to sell this land, for the payment of the debt due by *Mitchell's* heirs, he had

authority to direct the whole, or any part thereof, to be sold. He directed the trustee should sell so much as would be necessary to discharge the claim. The trustee, after the sale made a report of his proceedings to the Court of Chancery, in which he states the sale made to *Brown*, and the circumstances under which it was made. On the return of this report it was ratified *nisi*—public notice was given of this ratification, and no objections having been filed, it was about a year after its return *finally* ratified and confirmed. *Brown* having dealt with *Wallace* as trustee, and being reported the purchaser, if he wished to avoid the sale, because it was not made by *Wallace* as *trustee*, or that he had *exceeded* his authority, ought to have filed objections to the report. It is to be presumed, when the chancellor acted on this report, he was satisfied *Wallace* made the sale to *Brown* as trustee, and in a manner he was authorised *as such*, to make it. It was necessarily brought to his attention by the report itself, and his final ratification was conclusive upon the purchaser, *as to these questions*, he not having appealed from it.

Whether the opinion expressed by the chancellor, that a different course prevails in this State, from that adopted in *England*, as to the rule of *caveat emptor*, when applied to sales made by the trustees, under the decrees of the Court of Chancery, is correct, it is not necessary to decide in this case, because it clearly appears, the trustee at the time of sale expressly declared, he only sold the estate, right, and interest, which the *Mitchells* had in the said land, and if they had no right, he sold none. Here can be no pretence of warranty. *Brown* purchased the title of the *Mitchells*, be it what it might, and no more. This also disposes of the title set up by the *Govers*; in addition to which, the testimony shows, *Brown* was warned of their claim, and disregarded it. As to the objection urged in the argument, that the heirs of *Mitchell* had only an equitable title, the answer is, there is no such allegation in the bill, and therefore, not for the consideration of this

court.  The same answer may be given to the defence, that *Wallace* sold all the residue of *Rupulta*.  Although the complainants have attempted to prove it, they do not rely on it in their pleadings.  The deed to the *Cooleys* cannot avail the appellants.  If the land conveyed by it, was included within the lines of lot no. 11, as sold by the trustee in 1812, the deed in 1815 could not defeat *Brown's* title.  If it was not included within these lines, *Brown* has no right to complain of it, because it does not interfere with the land he bought.

The sale made to *Brown* was not for a gross sum, but by the acre.  Lot no. 11, was represented by the trustee as containing one hundred and forty-three acres, and *Brown* agreed to give twenty-three dollars for each acre it contained.  If therefore, he was in a situation to inquire into it, and could prove a deficiency, it would have been allowed him.  If he had desired a survey to ascertain this fact, he ought to have applied to the chancellor for it.  The testimony relied on for this purpose, does not prove satisfactorily there was a deficiency.  On the contrary, it appears a survey was made, to which *Brown* was privy, before he passed his bond, and it is to be presumed he was satisfied. *Brown* is not in a predicament to avail himself of the objections he relied on, had they been established.  In *England*, where the purchaser is permitted to show a defective title, it is only on condition he makes his complaint in a reasonable time, and that he has performed every thing on his part to entitle him to the equitable interference of the court. Here the sale was made on the 7th day of May, 1812. *Brown* had been present at the running of the land.  He was warned of the claim of the *Govers*.  He afterwards gave his bond—a suit was brought on this bond, prosecuted to judgment, and carried to the Court of Appeals, yet he makes no complaint until May, 1818, holding possession of the property, using it as his own, renting it out, and cutting wood on it; and still he asks equity, *without any offer*

to pay for the use and profits of the land, or for the injury he had done to it.

We agree with the chancellor upon the subject of jurisdiction. The decree to sell this land was in the Court of Chancery. The trustee and fund were under the control of the chancellor, and he alone, could compel *Wallace* to bring the money into court, to be properly disposed of. 'Tis true, both courts in ordinary cases have authority to grant injunctions, but where a suit has been commenced in one, it ought to be entitled to retain it. Unless this rule prevails, it is impossible that the decrees of either court, in many cases, can be carried into effect.

DECREE AFFIRMED.